**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

LARRY J. MERIS,                  )
                                 )
                Plaintiff,       )
                                 )
        v.                       )        1:21cv617
                                 )
SERGEANT C. YARBROUGH,[1]        )
                                 )
                Defendant.       )

## MEMORANDUM OPINION, ORDER, AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge for a recommendation on the motion to dismiss (Docket Entry 16) (the "Motion") filed by Sergeant C. Yarbrough (at times, the "Defendant").  For the reasons that follow, the Court should grant the Motion as specified herein.

## BACKGROUND

Alleging violation of his constitutional rights during his pretrial detention at the Guilford County Jail (the "Jail" or "Jail Central"), Larry Junior Meris (the "Plaintiff") initiated this action against Defendant pursuant to 42 U.S.C. § 1983.  (See Docket Entry 1 (the Complaint") at 1-11.)[2]  According to the Complaint, on November 11, 2020, Defendant assaulted Plaintiff while Plaintiff

_____

        1  For legibility reasons, this Opinion uses proper spelling and generally omits the word "the" before "Plaintiff" and "Defendant" in quotations from the parties' materials.

        2  Docket Entry page citations utilize the CM/ECF footer's pagination.

"was in full restraints/cuffs/shackles/chain," causing Plaintiff permanent injuries, including memory loss. (Id. at 5.) The Complaint indicates that Plaintiff did not file a grievance regarding this incident, as he "was on suicide watch" and "injured," suffering from memory loss and confusion, but he "did write request forms and ask[] for a grievance a lot[;]" however, officials would not "give [him] one." (Id. at 7-8.)

A few months after the filing of the Complaint, in October 2021 (see Docket Entry 15 at 12), Plaintiff filed an "Amended Complaint" (id. at 1), which states that he did file a grievance regarding this incident (see id. at 8). The Amended Complaint describes Plaintiff's grievance as claiming that Defendant "violated [Plaintiff's] rights and used excessive force [in that] he slapped [Plaintiff's] hand and slammed [his] head repeatedly and choked [him] out which caused an injury." (Id.) Per the Amended Complaint, the grievance had thus far yielded no result, but when Plaintiff "asked about [his] grievance on the county kiosk, Mrs. Southern and Captain Johnson state[d that] it's still being reviewed for a response." (Id.) As for additional information relevant to exhaustion of administrative remedies, the Amended Complaint states that Plaintiff "notif[ied] lots of staff here and wrote lots of request [sic]." (Id. at 9.)

Defendant moved to dismiss the Amended Complaint, contending, inter alia, that Plaintiff "failed to exhaust his administrative

2

remedies as required by the Prison Litigation Reform Act [(the "PLRA")] in Title 42 U.S.C. § 1997e" (Docket Entry 16 at 1). (<u>See</u> <u>id.</u> at 1-2.) In support of this contention, Defendant submitted various exhibits, including affidavits from two employees of the Guilford County Sheriff's Office (the "GCSO"). (<u>See</u> Docket Entries 17 to 18-2.) The "Affidavit of Captain J. Sellers" (Docket Entry 17 at 1) (the "Sellers' Affidavit") attaches a copy of the GCSO "'Inmate Handbook'" in effect during all relevant times. (<u>Id.</u>, ¶ 2.) Captain Sellers avers that the

> grievance policy and procedure is <u>verbally</u> explained to all inmates, including [Plaintiff], during the orientation process that takes place during the first few days following their arrival at the Jail. All inmates, including [Plaintiff], are also informed that a copy of the Inmate Handbook contains a <u>written</u> description the grievance policy and procedure, and that the Inmate Handbook is available in all inmate housing units to read and use, upon request. Specifically, the written description of the grievance procedure and policy is found at pages 27 - 29 of [the attached Inmate Handbook].

(<u>Id.</u>, ¶ 3 (emphasis in original).)

According to Captain Sellers:

Inmates may submit requests to GCSO staff either (1) "electronically through computer kiosks located in each housing unit, or (2) in handwriting by asking their Floor Officer for a document known as an Inmate Request Form ([at times, an] 'IRF')." (<u>Id.</u>, ¶ 5.) "As a general rule, all inmates have access to these electronic kiosks with the exception of those inmates in a disciplinary status. Inmates in a disciplinary status could,

3

however, utilize the handwritten, paper IRF's as an alternative means to submit requests." (Id.) GCSO retains copies of the electronic requests on a computer server at the Jail and retains copies of the IRFs in the relevant inmate's Jail file; inmates also receive a copy of their paper IRFs "to maintain for their own records." (Id., ¶ 6.) Further:

> 7. As described in pages 27 - 29 of the Inmate Handbook attached as Exhibit No. 1 to [Sellers'] Affidavit, [i]nmates may initiate the grievance process with a complaint made verbally or in writing. When there is a complaint, a Jail Staff member (usually the Floor Officer) will attempt to resolve the matter informally for the inmate. If the initial Jail Staff member is unable to provide a satisfactory remedy for the complaint, the complaining inmate may submit a request for assistance in resolving the complaint. These requests can be submitted electronically via a kiosk or in handwriting via the paper IRF. Requests are responded to by a higher-ranking Detention Staff Member who is above the Floor Officer in the Jail's chain of command. If the inmate is not satisfied with the response to his electronic or handwritten request, then the inmate must request a Grievance Form. Requests for Grievance Forms can also be submitted electronically via a kiosk or through a handwritten IRF.

> 8. An inmate's request for a Grievance Form will be reviewed by Detention Staff. If the inmate has previously attempted to resolve the complaint (albeit unsuccessfully) as described in Paragraph 7 above and identifies a complaint that is subject to the grievance process, the inmate will be issued a Grievance Form by the Shift Commander or Classification/Grievance Officer, who shall affix a date/time stamp to the Grievance Form. All forms associated with the Grievance Policy are produced and distributed to inmates in "carbon copy" format, allowing the inmate to retain for his/her records a copy of each form submitted as a part of this process.

(Id., ¶¶ 7-8.) Inmates may file grievances for a variety of issues, including the "actions of Jail Staff." (Id., ¶ 9.)

4

Additionally:

> As a general rule, and as described on pages 27 - 28 of the Inmate Handbook attached as Exhibit No. 1 [to Sellers' Affidavit], an inmate must submit his/her Grievance Form within three days from the date of the incident complained of, or within three days of learning that grounds for a complaint exist. A grievance will also be deemed timely if the inmate initiates the grievance process (as described in paragraphs 7 and 8 of [Sellers'] Affidavit above) within three days of the incident complained of and then submits his/her Grievance Form within three days of receiving that form from the Jail's Staff. These time limits are imposed to ensure that inmate complaints are resolved in [a] prompt manner and when the evidence and information concerning the incident is still available and fresh in the minds of those involved. An inmate's failure to satisfy these timelines for initiating the grievance process is considered a failure to comply with the Jail's grievance procedure.

(Id., ¶ 10.)

Upon receipt thereof, the Classification/Grievance Officer will forward the completed grievance form to the Division Commander, who "has twenty-one days to respond to the grievance." (Id., ¶ 11.) If dissatisfied with the response, the inmate can appeal from the Division Commander's response to the Bureau Commander. (Id., ¶ 12.) The same grievance procedures applied during three previous incarcerations that Plaintiff experienced at the Jail between August 9, 2019, and March 17, 2020. (Id., ¶ 13.)

As relevant here, the submitted Inmate Handbook provides:

**INMATE REQUESTS AND GRIEVANCES**

**INMATE REQUEST PROCEDURES:**

**Request** – to ask for or express a desire for routine, general information

5

When an inmate is requesting information, answers to
questions or responses to a request, initially this
should be directed to the floor officer or other
employee, to handle verbally in an informal response. If
the employee or floor officer is unable to assist, or if
it is of a sensitive nature of which the inmate does not
wish to discuss, a formal request form will be issued.
The form must be completed according to the instructions.
An inmate may request assistance from their
classification/grievance officer, floor officer or
another inmate. Once the information is properly filled
out the inmate must give the form to the floor officer or
employee who will review the form and either fulfill the
request or ensure routing to the Shift Commander. If the
Shift Commander can fulfill the request, it will be
answered and routed accordingly. General requests shall
be answered in five (5) business days. . . .

**Complaint** – an expression of pain, dissatisfaction or
resentment for a particular event or action[]

An inmate may submit a maximum of one Inmate Request Form
per day referencing a complaint. If the inmate exceeds
this maximum, all pending Inmate Request Forms will be
returned to the inmate indicating that they have been
rejected for that reason. These restrictions do not
apply to requests for indigent kits, law library,
chaplain services, sick call, allegation of sexual abuse
and similar routine requests. Repetitious Inmate Request
Forms are not allowed and will be returned to the inmate
indicating that they have been rejected for that reason.

**INMATE GRIEVANCE PROCEDURE:**

Generally, an informal resolution may resolve a complaint
without a formal grievance being filed. The informal
resolution process is initiated by the inmate. When
there is an indication of a complaint, the officer or
employee shall attempt a remedy for the inmate. If the
officer or employee is unable to provide a satisfactory
remedy for the complaint, the officer or employee shall
issue a request form to the inmate. Only if the inmate
has satisfied the above requirements and is unsatisfied
with the resolution of that request or complaint, then
the inmate can request a grievance form. To do so, the
inmate must submit an Inmate Request Form requesting a
grievance form, stating the matter to be grieved, and
detailing how the inmate has complied with the forgoing

6

requirements. If proper, the inmate will then be issued a Grievance Form by the Shift Commander or Classification/Grievance Officer, who shall affix a date/time stamp to the form. Grievances are limited to the request or complaint with respect to which the inmate satisfied the above requirements. The inmate must fully complete the form. The inmate must file the grievance within three (3) days from the date of the incident, the discovery of the incident, when they reasonably should have discovered the incident, [sic] giving rise to the complaint, or within three (3) days of receipt of a response to an inmate request form. These restrictions do not apply to allegation of sexual abuse. The inmate may request assistance from staff or another inmate to help complete the form. One (1) grievance may be submitted and filed at any one time on a single incident or issue of concern. An inmate may only submit a new grievance once the initial or current grievance has been resolved or returned with a response.

After completing the form, within three (3) days from the stamped time/date, the inmate must notify the Classification/Grievance Officer to retrieve the completed grievance form. The Classification/Grievance Officer will then issue the inmate a receipt/acknowledgment.

Upon receipt of the grievance, the classification/grievance officer will forward the grievance to the Division Commander. The Division Commander will have twenty-one (21) days to respond to the grievance. . . .

\* \* \* \* \*

**INMATES MAY FILE GRIEVANCES REGARDING THE FOLLOWING ISSUES:**

\* \* \* \* \*

3. Actions of employees or other inmates.

4. Incidents that personally affect the grievant.

\* \* \* \* \*

7

**APPEALS OF GRIEVANCES:**

If an inmate is not satisfied with the response given, the inmate may file an appeal to the Bureau Commander of the detention bureau within three days of receipt of the response.

1. The inmate must request a grievance appeal form from their classification/grievance officer.

2. The completed appeal forms must be filed with the classification/grievance officer by placing the completed forms in the grievance boxes located on each floor or giving it to your [sic] Classification/Grievance Officer. These forms will be retrieved Monday through Friday and forwarded to the Detention Bureau Commander.

3. The Bureau Commander has forty-five (45) days from the receipt of the appeal to reply.

4. The response from the Bureau Commander shall be the final step in the appeal process.

(Docket Entry 17-1 at 27-29 (emphasis in original).)

Officer M. Diehl, "the GCSO's Court Liaison Officer," also provided an affidavit in support of the Motion. (Docket Entry 18 (the "Diehl Affidavit"), ¶ 1.) According to Officer Diehl, his official job duties involve maintaining "records of the [IRFs] and Inmate Grievance Forms at the [Jail]." (Id.) Per the Diehl Affidavit:

Officer Diehl "personally searched through Jail Central's archive of Inmate Request Forms and Inmate Grievance Forms." (Id., ¶ 3.) "This records archive is where such forms are placed and maintained in the ordinary course of business and according to policy at Jail Central." (Id., ¶ 4.) "Attached as Exhibit No. 1 to [the Diehl] Affidavit are true, accurate, and complete copies of

8

all handwritten, paper IRF's submitted by Plaintiff at Jail Central since the beginning of his most recent period of incarceration on July 29, 2020 through the date of [the Diehl] Affidavit." (Id., ¶ 5 (emphasis omitted).) "This exhibit consists of 69 pages and the requests have been placed in chronological order." (Id.) "Attached as Exhibit No. 2 to [the Diehl] Affidavit are true, accurate, and complete copies of all electronically-submitted kiosk requests submitted by Plaintiff at Jail Central since the beginning of his most recent period of incarceration on July 29, 2020 through the date of [the Diehl] Affidavit." (Id., ¶ 6 (emphasis omitted).) "This exhibit consists of 85 pages and the requests have been placed in chronological order." (Id.)

Officer Diehl "personally reviewed each page of the documents included in Exhibit Nos. 1 and 2 to [the Diehl] Affidavit. [His] review confirms that Plaintiff never filed a Grievance Form concerning the November 11, 2020 incident with Sergeant Yarbrough that is the subject of this lawsuit." (Id., ¶ 7 (emphasis omitted).) Per Officer Diehl's review, only the following documents among Plaintiff's requests relate to the incident on November 11, 2020:

> **Ex. No. 1 at p. 9** — On 11/14/2020, Plaintiff requested the names of witnesses to the 11/11/20 incident with Sergeant Yarbrough;
>
> **Ex. No. 1 at p. 10** — On 11/14/2020, Plaintiff requested the return of personal property items that he claimed were seized by Staff on 11/11/2020. In this document,

Plaintiff admits the he "assaulted Sergeant Yarbrough" on 11/11/2020;

**Ex. No. 1 at p. 22** — On 3/7/2021, Plaintiff requested the return of personal property items that he claimed were seized by Staff on 11/11/2020;

**Ex. No. 1 at p. 39** — On 6/2/2021, Plaintiff requested early release from his disciplinary status and apologized for assaulting Sergeant Yarbrough;

**Ex. No. 1 at p. 47** — On 6/27/2021, Plaintiff again requested early release from his disciplinary status and apologized for assaulting Sergeant Yarbrough;

**Ex. No. 1 at p. 54** — On 7/10/2021, Plaintiff, for the very first time, requested a Grievance Form for the subject incident on 11/11/2020. This request was submitted approximately <u>8 months after</u> the subject incident with Sergeant Yarbrough. His request for a grievance was denied by Captain [Johnson] because it did not comply with the time lines and other requirements in the Jail's inmate grievance procedure;

**Ex. No. 1 at p. 55** — On 7/11/2021, allegedly for purposes of his federal lawsuit, Plaintiff requested Sergeant Yarbrough's full name and badge number. He was informed by Captain Johnson that it would be sufficient to identify the Sergeant by using his rank and last name. As a safety precaution, the GCSO does not reveal the full names of its Deputies and Detention Officers, but does provide the rank, first initial of the first name, and full last name. Moreover, Detention Officers like Sergeant Yarbrough do not have badge numbers;

**Ex. No. 1 at p. 59** — On 7/11/2021, Plaintiff wrote Sergeant Yarbrough and asked for a copy of his disciplinary statement for the subject incident on 11/11/2021. In this document, Plaintiff uses the words "the assault on you" referring to the assault on Sergeant Yarbrough;

**Ex. No. 1 at p. 60** — On 7/22/2021, Plaintiff repeats the preceding request.

**Ex. No. 2 at pp. 35 - 37** — Between 8/20/2021 and 8/23/2021, Plaintiff submitted three requests asking for assistance to send a check to the clerk of court in the

amount of $350.00. It is not clear if this request is connected to this lawsuit. This request was, however, addressed by Jail Staff;

**Ex. No. 2 at p. 54** — On 9/29/2021, Plaintiff submitted a kiosk request in which he claimed that several Detention Officers (including Sergeant Yarbrough) lacked training and were violent. This kiosk request was submitted almost two months after Plaintiff filed his lawsuit on 8/3/2021 and approximately 10 and ½ months after the subject incident on 11/11/2020.

**Ex. No. 2 at p. 59** — On 9/29/2021, Plaintiff submitted a kiosk request asking for a Grievance Form for the incident with Sergeant Yarbrough. This request was submitted approximately 10 and ½ months after the subject incident on 11/11/2020.

**Ex. No. 2 at p. 61** — On 10/1/2021, Plaintiff repeats the same request.

**Ex. No. 2 at p. 81** — On 10/27/2021, Plaintiff repeats the same request.

**Ex. No. 2 at pp. 83 - 85** — On 11/8/2021, Captain Johnson completed her research concerning Plaintiff's kiosk requests at pp. 59 and 81 above and responded by informing Plaintiff that he had not previously submitted a grievance concerning the incident that is the subject of this lawsuit and that he had not complied with the GCSO's grievance procedure.

(Docket Entry 18, ¶ 7 (emphasis in original).)

As indicated, Plaintiff filed two IRFs on November 14, 2020.

In the first IRF, addressed to Captain Sellers, Plaintiff states:

On [November 11, 2020] around 4:50 p.m. to 5:20 p.m. in Cell 5 on [the] Main Floor next to Cell 7 Dry Cell I was assaulted with excessive force while in full restraints[.] Can you please tell me all the employees who were present at this time outside and inside this cell who s[aw] this incident? Thank you please respond.

(Docket Entry 18-1 at 9.) On December 8, 2020, Captain Sellers

responded: "We are unable to provide this information." (Id.)

11

In the second IRF, also addressed to Captain Sellers, Plaintiff states:

> Hi, on [November 11, 2020] I caught 2 street charges I assaulted [Defendant], well him and his team took my bin afterwards out of 5E[.] It had my radio/headphones, my pictures[,] and all my address[es] and legal work in it[.] It went missing and hasn't been found[.] Now all this is on camera[.] I want my property.

(Id. at 10.) On December 8, 2020, Captain Sellers responded: "All property in your possession was placed in storage." (Id.)

Plaintiff wrote another IRF to Captain Sellers on November 27, 2020, regarding his property. (Id. at 11.) Captain Sellers likewise responded to this IRF on December 8, 2020. (Id.) The next IRF in the record, also addressed to Captain Sellers, bears the date of December 14, 2020. (Id. at 12.) In it, Plaintiff states:

> Sir, I have 2 questions sorry to bother you, I know y'all hate me, but can you please get all my mail and legal work out of my property and send it to me for my bin so I can have it during my hour out? Question 2 is "Co Coward" and Co "Ritter" said I couldn't read my mail Christmas cards during my hour out he said it's policy I can't read my mail! And why did Disciplinary give me 60 days for a self inflict self harm charge?? I'm mental health and on suicide watch!

(Id. (emphasis in original).) On December 15, 2020, Captain Sellers responded: "What legal work are you referring to? You can have access to any new mail on your hour out. You were given 20 days Disc." (Id.)

12

The Clerk thereafter sent Plaintiff a Roseboro Notice concerning the Motion. (See Docket Entry 21.)[3] The Roseboro Notice informed Plaintiff that Defendant "filed a Motion to Dismiss . . ., which may or may not be supported by affidavits" and that Plaintiff possessed "the right to file a 20-page response in

---

3 Contemporaneously with filing the Motion, Defendant filed an answer in which he asserted a counterclaim for assault and battery under North Carolina law. (See Docket Entry 20 (the "Answer") at 5-6.) The Roseboro Notice did not address the Answer or counterclaim (see Docket Entry 21) and neither the Answer nor any other filing cautioned Plaintiff regarding the need to respond to the counterclaim (see Docket Entries dated Nov. 9, 2021, to Dec. 21, 2021). On December 21, 2021, Defendant moved for, and the Clerk granted, entry of default on his counterclaim on the grounds that Plaintiff failed to respond thereto. (See Docket Entries 31-34.) Shortly thereafter, in filings received by the Court on December 30, 2021, and January 3, 2022, Plaintiff addressed the default, indicating that he lacked awareness of his need to answer the counterclaim and that he disputed Defendant's counterclaim. (See Docket Entry 35 at 3 ("My rights were violated and Defendant used excessive force on me. I was injured, I paid and filed suit on Defendant, this is about what he did to me on video footage . . . . This case is about what Defendant did to Plaintiff and Defendant filed motion of default for counterclaim, the Court did not tell me I had to answer to that[.] It's nonsense, I answer and study as much as I can[.] I feel taken advantage of!" (emphasis in original)); Docket Entry 36 at 1 ("I want to apologize for my mistakes I make in my case . . . . I also want to apologize for not answering Defendant's counterclaim! I did not know I was to answer that, it did not state nor I was notif[ied] that I had [a] certain time to answer that! I don't see how Defendant is suffering [be]cause he is still working at the [Jail] running down the hallways every day! . . . Just remember, I filed the complaint, I am the victim, Defendant smacked my hand first, I am the Plaintiff, I got a felony I got to pay for the headbutt I did, but this gives [Defendant] no excuses why he used excessive force on me while in full restraints!").) Under the circumstances, the undersigned deems Plaintiff's filings a request to set aside the default pursuant to Federal Rule of Civil Procedure 55(c), see Erickson v. Pardus, 551 U.S. 89, 94 (2007) ("A document filed pro se is to be liberally construed." (internal quotation marks omitted)), and will order Defendant to appropriately respond.

13

opposition to this motion." (<u>Id.</u> at 1.) The Roseboro Notice warned Plaintiff that:

> Your failure to respond or, if appropriate, to file affidavits or evidence in rebuttal within the allowed time may cause the court to conclude that the defendants' contentions are undisputed and/or that you no longer wish to pursue the matter. Therefore, unless you file a response in opposition to the motion, it is likely your case will be dismissed or judgment granted in favor of the defendants. **A response to this Motion to Dismiss must be filed within 21 days from the date of service of the Motion upon you.**
>
> Any response you file should be accompanied by a brief containing a concise statement of reasons for your opposition and a citation of authorities upon which you rely. You are reminded that affidavits must be made on personal knowledge, contain facts admissible in evidence and be made by one shown to be competent to testify. A false statement under oath or under penalty of perjury may be a crime punishable as provided by law.

(<u>Id.</u> (emphasis in original).)

Plaintiff filed a response, with exhibits, in opposition to the Motion. (<u>See</u> Docket Entry 24 (the "Response") at 1-21.)[4] As relevant here, the Response states:

Plaintiff "did not file a grievance, although [he] tried [his] best to get a grievance and [he] kept trying." (<u>Id.</u> at 10.)[5]

_____

4    Although he subsequently filed various declarations (regarding the merits of his claim) under penalty of perjury (<u>see</u> Docket Entry 26), Plaintiff did not verify the assertions in his Response (<u>see generally</u> Docket Entry 24).

5    Plaintiff explained that, due to his head injury from Defendant's alleged assault, he cannot "remember if [he] did file a grievance [be]cause a lot has happened to [him] in this time period." (<u>Id.</u> at 12.) However, in response to Plaintiff's request for a grievance form regarding the incident, on September 30, 2021,
(continued...)

"[T]he reason [he] could not get a grievance was due to the fact [that he] was on suicide watch at the time of the incident." (Id.) Under Jail policy, inmates on suicide watch cannot possess paper or writing utensils. (Id.; see also id. at 20 (indicating inmates on suicide watch may possess only two paper gowns, one pair of flip-flops, and one blanket unless Health Services Administrator and Division Commander authorize additional item(s)); accord Docket Entry 17-1 at 26 (same).) Plaintiff "asked several officers on and after the incident for a grievance for what happened and [he] was denied every time due to suicide watch." (Docket Entry 24 at 10.) While on suicide watch, Plaintiff also lacked access to the kiosk to ask for a grievance electronically. (See, e.g., id. at 11.) Plaintiff remained on suicide watch in a disciplinary block for nine months straight, such that he could "only come out [of his cell] 1 hour, 3 times a week in chains and cuffs only. When [he] came off suicide watch [he] asked for a grievance and was told it was too late that [he] didn't follow the inmate handbook grievance procedure." (Id. at 10; see also id. at 10-11 (explaining that exhibits show that, on July 10, 2021, Plaintiff "asked for a grievance form for the incident on [November 11, 2020] and [his]

---

5(...continued)
"Captain Johnson responded — 'you already filed a grievance for this issue' . . . .[,] so [Plaintiff] asked the Court to send [him] a[n] amended complaint [and on his] new [Section] 1983 [he] wrote [that he] did file a grievance [be]cause Mrs. Captain Johnson admits that [he] already did one!" (Id. at 12-13.)

request was denied[; he] was off suicide watch now so [he] was allowed to request this finally and was denied").)

Plaintiff contends that the three-day limit "is not enough time" to file a grievance (id. at 10), especially as the "Jail do[es]n't want to give inmate[s] grievances [be]cause they don't want to be sued" (id. at 13). Plaintiff proffered three additional arguments regarding "why [he] can't file a grievance." (Id. at 15.) First, "exhaustion would hurt [his] ability to sue [be]cause it would take too long." (Id.) Second, the GCSO "grievance system can't give [him] what [he] want[s], which is money damages and to have [Defendant] wr[it]te[n] up!" (Id.) Third, the Jail "is biased and the[ staff] already decided the issue, but [Plaintiff] was on 'suicide watch', and the officers g[a]ve the body language like 'yea right' we don't give grievances here!" (Id.) Mainly, though, Plaintiff emphasizes that inmates do not need to exhaust administrative remedies if they "were unable to file a grievance through no fault of [their] own" and Plaintiff remained on suicide watch at the time of the incident and for three days thereafter, precluding him from filing a timely grievance. (Id. (emphasis in original).)

In reply, Defendant maintains that inmates need only initiate the grievance process, which can occur verbally or in writing, within three days of the incident and then file the grievance form within three days of receiving the form. (See Docket Entry 30 at

16

1-2.)  In light of this verbal option, Defendant contends that Plaintiff's suicide watch status did not preclude him from timely initiating the grievance process.  (Id. at 2-3.)  Moreover, Defendant asserts,

> as shown by the exhibits to the Diehl Affidavit, Plaintiff submitted two written requests to the Jail's Staff on November 14, 2020 — i.e., within three days of the November 11, 2020 incident.  (DE 18-1 at pp. 9-10).  As such, Plaintiff cannot truthfully claim that being on suicide watch prevented him from accessing pen and paper to lodge a grievance.

(Docket Entry 30 at 3 (emphasis and footnote omitted).)  Defendant further highlights instances in the record that "show that at different times during his pre-trial confinement at Jail Central, Plaintiff accessed pen and paper (for the purpose of submitting a written Inmate Request Form) and used the kiosk system while still on suicide watch."  (Id. (emphasis omitted) (citing Docket Entry 18-1 at 8 and Docket Entry 18-2 at 1).)  Finally, Defendant maintains that, even if the first of Plaintiff's IRFs from November 14, 2020, "is liberally construed as an effort to initiate the grievance process, Plaintiff still did not follow through with the straightforward grievance procedure described in Captain Sellers' Affidavit which includes seeking resolution at a low level, asking for a Grievance Form, and appealing any unsatisfactory response to the grievance."  (Id. at 3 n.3 (citing Docket Entry 17, ¶¶ 7-12).)

17

Plaintiff filed an unauthorized "response to Defendant's reply brief in support." (Docket Entry 35 (the "Surreply") at 1.)[6] As relevant here, the Surreply states:

> Defendant makes it sound like it's easy to get a grievance at the [Jail], fact[] is it's not, even when a[n] inmate follows policy and ask[s] or tries to initiate the grievance process[,] we're always denied by Captain Johnson! You can look at the grievance percentage at this Jail and I promise you it will be very []low! Then Defendant states [that] Captain Sellers states [that an] inmate can initiate the grievance process with a simple verbal or written complaint to the floor officer[.] This is not true at all, we the inmates wish it was this easy[.]
>
> Just [be]cause [the] Inmate Handbook states it does not prove it's right, [be]cause fact[] is the officers here don't even follow their own policy here[. T]hey do whatever they want and get away with it, inmates here at the [Jail are] treated inhumane, Equal Protection is violated [be]cause officers treat us like animals and we're told we have no rights! I was most recently sent to the hole[, a] disciplinary block[,] for writing a request asking for a grievance, I DID 15 DAYS in [the] hole for this[,] so no, inmates can't get grievances here! As of the [November 11, 2020] incident[,] I was on suicide watch in 5D[, a] disciplinary block, the kiosk in this block is broken and inmates are not allowed to use it at all! My argument is not flawed[.] Defendant states I the plaintiff could have initiated the grievance process verbally, I the plaintiff live here I know this is a[n] outrageous lie, if this was the case inmates here would be filing lots of grievances! Then Defendant[] states my communication with Captain Johnson (DE 24 at pg. 21) is highly misleading. However, [the] reason why I did not attach the last communication from Captain Johnson is, 1. I was proving [to] the Court why I changed my Amended Complaint about filing a grievance. 2. I want to show the Court [that] Captain Johnson stated I DID file a grievance then she changes it up! I asked for a

---

6 Plaintiff did not verify the assertions in his Surreply. (See id. at 1-4.)

grievance for the incident 8 months later which I already
explained briefly!

Plaintiff had a head injury, I lost part of my
memory[.]  Defendant forgets how he smashed my head on
the concrete repeatedly[,] which caused memory los[s] and
speech impairment!  I ask[ed] for a grievance 8 months
later [be]cause, 1. I was off suicide watch, 2. I forgot
if I did file a grievance or not!  Everything that
happened on [November 11, 2020] is on video footage,
Plaintiff seeks not to lie!  Defendant wants to keep this
away from the Court, Defendant is guilty and he knows it!

(Docket Entry 35 at 1-3 (emphasis in original).)

## DISCUSSION

### I. Relevant Standards

Defendant moved to dismiss Plaintiff's amended complaint for
failure to exhaust administrative remedies under the PLRA.  (See
Docket Entry 16 at 1.)  The failure to exhaust administrative
remedies under the PLRA constitutes an affirmative defense.  See
Jones v. Bock, 549 U.S. 199, 216 (2007).  Thus, although the Motion
does not so acknowledge (see generally Docket Entry 16), Defendant
purports to bring his exhaustion argument under Rule 12(b)(6) of
the Federal Rules of Civil Procedure (the "Rules").  See, e.g.,
Albino v. Baca, 747 F.3d 1162, 1169 (9th Cir. 2014) (explaining
that "in those rare cases where a failure to exhaust is clear from
the face of the complaint, a defendant may successfully move to
dismiss under Rule 12(b)(6) for failure to state a claim," but
that, "[i]n a typical PLRA case, a defendant will have to present
probative evidence — in the words of Jones, to 'plead and prove' —
that the prisoner has failed to exhaust available administrative

19

remedies under § 1997e(a)," by "mov[ing] for summary judgment under Rule 56").

A Rule 12(b)(6) motion "tests the sufficiency of a complaint," but "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). Accordingly, in reviewing a Rule 12(b)(6) motion, "a court evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011). The Court may also consider documents "attached to the motion to dismiss, so long as they are integral to the complaint and authentic." Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009). Generally, a "court cannot go beyond these documents" without "convert[ing] the motion into one for summary judgment." E.I. du Pont, 637 F.3d at 448.

Accordingly, Rule 12 provides that,

> when matters outside the pleadings are submitted with a [Rule 12(b)(6)] motion to dismiss . . ., "the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." In interpreting the requirements of this rule, [the United States Court of Appeals for the Fourth Circuit] has held that the term "reasonable opportunity" requires that all parties be given "'some indication by the court . . . that it is treating the 12(b)(6) motion as a motion for summary judgment,' with the consequent right in the opposing party to file counter affidavits or pursue reasonable discovery." When a party is aware that material outside

20

the pleadings is before the court, the party is on notice
that a Rule 12(b)(6) motion may be treated as a motion
for summary judgment.

Gay v. Wall, 761 F.2d 175, 177 (4th Cir. 1985) (citations omitted)
(second ellipsis in original).

Under Rule 56, "[t]he [C]ourt shall grant summary judgment if
the movant shows that there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter of
law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact
exists "if the evidence is such that a reasonable jury could return
a verdict for the nonmoving party." Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 248 (1986). The movant bears the burden of
establishing the absence of such dispute. Celotex Corp. v.
Catrett, 477 U.S. 317, 323 (1986). Moreover,

> [w]here, as here, the movant seeks summary judgment
> on an affirmative defense, [he] must conclusively
> establish all essential elements of that defense. When
> the defendant has produced sufficient evidence in support
> of [hi]s affirmative defense, the burden of production
> shifts to the plaintiff to come forward with specific
> facts showing that there is a genuine issue for trial.

Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc., 673 F.3d 294,
299 (4th Cir. 2012) (citation and internal quotation marks
omitted).

Notably, "the non-moving party may not rely on beliefs,
conjecture, speculation, or conclusory allegations to defeat a
motion for summary judgment." Lewis v. Eagleton, No. 4:08-cv-2800,
2010 WL 755636, at *5 (D.S.C. Feb. 26, 2010) (citing Baber v.

21

Hospital Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992)),
aff'd, 404 F. App'x 740 (4th Cir. 2010); see also Pronin v.
Johnson, 628 F. App'x 160, 161 (4th Cir. 2015) (explaining that
"[m]ere conclusory allegations and bare denials" or the nonmoving
party's "self-serving allegations unsupported by any corroborating
evidence" cannot defeat summary judgment). Further, factual
allegations in a complaint or other court filing constitute
evidence for summary judgment purposes only if sworn or otherwise
made under penalty of perjury. See Reeves v. Hubbard, No.
1:08cv721, 2011 WL 4499099, at *5 n.14 (M.D.N.C. Sept. 27, 2011),
recommendation adopted, slip op. (M.D.N.C. Nov. 21, 2011).

## II. Exhaustion Requirement

As relevant here, the PLRA provides that "[n]o action shall be
brought with respect to prison conditions under section 1983 of
this title, or any other Federal law, by a prisoner confined in any
jail, prison, or other correctional facility until such
administrative remedies as are available are exhausted." 42 U.S.C.
§ 1997e(a). Under the PLRA, exhaustion "is mandatory" and courts
lack discretion to waive the exhaustion requirement. Woodford v.
Ngo, 548 U.S. 81, 85 (2006). Moreover, the "exhaustion requirement
applies to all inmate suits about prison life, whether they involve
general circumstances or particular episodes, and whether they
allege excessive force or some other wrong." Porter v. Nussle, 534
U.S. 516, 532 (2002). The defendant bears the burden of

22

establishing that a prisoner failed to exhaust administrative remedies. See Jones, 549 U.S. at 216 ("We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints.").

Nevertheless, the "exhaustion of administrative remedies under the PLRA is a question of law to be determined by the judge." Drippe v. Tobelinski, 604 F.3d 778, 782 (3d Cir. 2010); see also Woodhouse v. Duncan, 741 F. App'x 177, 178 (4th Cir. 2018) ("'[J]udges may resolve factual disputes relevant to the exhaustion issue without the participation of a jury.'" (quoting Small v. Camden Cnty., 728 F.3d 265, 271 (3d Cir. 2013)) (brackets in original)); Lee v. Willey, 789 F.3d 673, 677 (6th Cir. 2015) ("[A]ll . . . of the circuits that have considered the issue agree that judges may resolve factual disputes relevant to the exhaustion issue without the participation of a jury." (internal quotation marks omitted)). A prisoner satisfies the PLRA exhaustion requirement when he "ha[s] utilized all available remedies 'in accordance with the applicable procedural rules,' so that prison officials have been given an opportunity to address the claims administratively." Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008) (quoting Woodford, 548 U.S. at 88). Thus, the relevant prison's grievance procedures determine the steps that a prisoner must take to meet his exhaustion obligations. See id. at 726.

23

Because prisoners must comply with the applicable grievance policy, they fail to properly exhaust when they miss grievance policy deadlines. See Jones, 549 U.S. at 217-18 ("*Woodford* held that 'proper exhaustion' was required under the PLRA, and that this requirement was not satisfied when grievances were dismissed because prisoners had missed deadlines set by the grievance policy."); Woodhouse, 741 F. App'x at 178 ("The PLRA 'requires proper exhaustion,' which 'means using all steps that the agency holds out, and doing so *properly*,' to allow the agency a full and fair opportunity to address the issues on the merits. 'Proper exhaustion,' therefore, 'demands compliance with an agency's deadlines and other critical procedural rules.'" (emphasis in original) (citation omitted)). Moreover, prisoners must exhaust their administrative remedies even if the administrative process does not offer the type of relief that they seek, such as monetary damages. See Booth v. Churner, 532 U.S. 731, 736-41 (2001).

However, "an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." Moore, 517 F.3d at 725. In this regard, the United States Supreme Court has identified three circumstances wherein an administrative remedy qualifies as unavailable: (1) "it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) it remains "so opaque that it becomes, practically

24

speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Ross v. Blake, 578 U.S. 632, 643-44 (2016).

### III. Analysis

As a preliminary matter, Defendant relies on exhibits outside the Amended Complaint in support of his Motion. (Compare Docket Entry 15, with Docket Entries 16-19.) Accordingly, his Motion more properly constitutes a request for summary judgment than for Rule 12(b)(6) dismissal. See Fed. R. Civ. P. 12(d). Under the circumstances, including that both parties submitted exhibits in support of their respective positions (see Docket Entries 17-1, 18-1, 18-2; see also Docket Entry 24 at 17-21) and neither side indicated a need for additional discovery regarding the exhaustion issue (see Docket Entries 16-19, 24, 26, 30, 35, 36), the Court should treat Defendant's Motion as one for summary judgment under Rule 56. See Gay, 761 F.2d at 177.

The GCSO imposes a three-day deadline for initiating a grievance. (See Docket Entry 17-1 at 27-28.) Although the Inmate Handbook lacks clarity on this point (see id. at 27 (distinguishing between requests and complaints and indicating that inmates should first verbally direct requests to staff and that inmates should engage in "informal resolution process" regarding complaints prior to requesting grievance form on IRF)), Captain Sellers avers that

"[i]nmates may initiate the grievance process with a complaint made verbally or in writing" (Docket Entry 17, ¶ 7).  In his unsworn Surreply, Plaintiff disputes inmates' ability to initiate the grievance process verbally.  (See Docket Entry 35 at 1-2.)  Whether an inmate can initiate the grievance process verbally does not affect resolution of the Motion, however, because the record reflects that Plaintiff possessed the ability to timely initiate the grievance process through a written IRF, notwithstanding the limitations that his suicide watch status imposed (see Docket Entry 24 at 20).  (See, e.g., Docket Entry 18-1 at 9-10 (reflecting that Plaintiff submitted IRFs regarding relevant incident within three-day period).)[7]

Similarly, any unavailability of the electronic kiosk during the relevant suicide watch stint does not affect resolution of the Motion because the grievance process permitted both handwritten and electronically submitted materials.  (See Docket Entry 17, ¶ 7.)  Because the record establishes that Plaintiff managed to submit IRFs during the relevant period notwithstanding the communication

---

7  To the extent the Court could deem Plaintiff's initial IRF, which alleges that he "was assaulted with excessive force while in full restraints" on November 11, 2020 (id. at 9), the initial step in the grievance process, the record contains no indication that Plaintiff requested a grievance form or appealed from Captain Sellers' unfavorable resolution of that IRF (see id. (declining to provide requested information)), despite Plaintiff's ability to submit an IRF shortly after Captain Sellers' denial of that IRF (see id. at 12).  (See Docket Entries 18-1, 18-2; see also Docket Entry 17-1 at 27-29 (outlining grievance process, including appeal steps).)

Case 1:21-cv-00617-LCB-LPA   Document 44   Filed 07/21/22   Page 26 of 29

limitations his suicide watch status imposed, he remains subject to the PLRA exhaustion requirements. See Moss v. Harwood, 19 F.4th 614, 621-23 (4th Cir. 2021) (rejecting argument that inmate's lockdown status and jail officials' attempts to thwart his participation in grievance procedure excused inmate from PLRA exhaustion requirement where inmate overcame such obstacles and participated in grievance process, but failed to raise relevant contention, explaining that "where, as here, an inmate in fact is able to participate in a grievance process, notwithstanding alleged obstacles, then that process remains 'available' for purposes of the PLRA"). And the record establishes (see Docket Entries 18-1, 18-2), as Plaintiff concedes (see, e.g., Docket Entry 24 at 10-13), that he failed to pursue a grievance regarding Defendant's alleged use of excessive force on November 11, 2020, within the GCSO grievance policy's deadlines. Plaintiff therefore failed to properly exhaust his administrative remedies. See, e.g., Woodhouse, 741 F. App'x at 178.

Plaintiff's assertions that "exhaustion would hurt [his] ability to sue [be]cause it would take too long" and that the grievance process cannot "give [him] what [he] want[s]," namely "money damages and to have [Defendant written] up," (Docket Entry 24 at 15) do not excuse him from the exhaustion requirement. See Booth, 532 U.S. at 736-41. Further, Plaintiff declined to make his assertions regarding Jail officials' alleged interference with

27

the grievance process, Captain Johnson's alleged denial rate, and Jail officials' alleged failure to comply with the grievance process under oath or otherwise under penalty of perjury. (See Docket Entries 24, 35.) Plaintiff's unsworn allegations do not constitute evidence. See Reeves, 2011 WL 4499099, at *5 n.14. Accordingly, Plaintiff's contentions regarding the unavailability of the grievance process fail to excuse him from exhausting his administrative remedies on his excessive force claim. See, e.g., Moss, 19 F.4th at 621-23 (rejecting argument that grievance procedure remained unavailable to inmate where evidence established his submission of grievances during relevant period). The Court should therefore dismiss Plaintiff's Amended Complaint without prejudice for failure to exhaust administrative remedies.[8]

## CONCLUSION

The evidence establishes that Plaintiff failed to exhaust his administrative remedies as required under the PLRA, necessitating dismissal of the Amended Complaint. In addition, Plaintiff contests the entry of default on Defendant's counterclaim, necessitating further briefing on the propriety of setting aside the default under Rule 55(c).

---

[8] Defendant seeks dismissal with prejudice of Plaintiff's Amended Complaint for failure to exhaust administrative remedies. (See, e.g., Docket Entry 16 at 1-2.) As the Fourth Circuit recently reaffirmed, courts should dismiss without prejudice for failure to exhaust administrative remedies. See Moss, 19 F.4th at 623 n.3.

**IT IS THEREFORE RECOMMENDED** that the Court grant the Motion (Docket Entry 16) as follows:  Plaintiff's Amended Complaint should be dismissed without prejudice for failure to exhaust administrative remedies.

**IT IS FURTHER ORDERED** that, by August 4, 2022, Defendant shall file a memorandum of no more than 10 pages regarding whether the Court should, pursuant to Rule 55(c), set aside the entry of default on Defendant's counterclaim (Docket Entry 34).  The Clerk shall refer that memorandum to the undersigned upon its filing.

This 21st day of July, 2022.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**
